STATE OF CONNECTICUT *v.* WILLIAM C.[1]
(AC 19540)

Lavery, C. J., and Landau and Dranginis, Js.

---

[1] In accord with court policy to protect the privacy rights of victims in matters concerning sexual abuse, we decline to use the names of individuals involved in this appeal. See General Statutes § 54-86e.

Argued November 29, 2001—officially released July 16, 2002

*Hubert J. Santos*, with whom, on the brief, was *Hope C. Seeley*, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *John M. Bailey*, chief state's attorney, and *Sandra L. Tullius*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LANDAU, J. In this criminal appeal, the defendant claims primarily that the trial court deprived him of his constitutional right to a fair trial by failing to disclose certain documents in a timely fashion and by making improper evidentiary rulings, thereby depriving him of the right to present a defense and to confront witnesses against him. In essence, the defendant claims that because he did not have access to the documents in a timely fashion, he was denied the opportunity to conduct an exhaustive cross-examination of the victim, who was an admitted liar. After conducting a thorough review of the transcript and an in camera review of the records at issue, we conclude that the defendant's claims are without merit. We conclude that the defendant's secondary claims concerning the court's jury instructions are without merit as well. We therefore affirm the judgment of the trial court.

The defendant appeals from the trial court's judgment of conviction, rendered after a jury trial, of sexual

assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A)[2] and risk of injury to a child in violation of General Statutes (Rev. to 1995) § 53-21 (1), as amended by Public Acts 1995, No. 95-142, § 1.[3] With respect to the charges, the defendant admitted that he had applied lotion to the victim's back and torso, including her chest and the sides of her breasts. The jury therefore had to determine whether the defendant touched the victim in a sexual manner so as to violate the prohibitions of the statute, § 53a-73a (a) (1) (A), which required the jury to assess the defendant's credibility with regard to his intent.

On appeal, the defendant raises eight claims that fall within the broad categories of either (1) a deprivation of the constitutional right to a fair trial, (2) an improper application of the rules of evidence or (3) an improper instruction to the jury.

The following facts are relevant to this appeal. When the victim was quite young, the department of children and families (department) removed her from the home of her biological parents. She lived with her maternal grandmother for a period of time before the defendant and his wife began to care for her. The defendant and his wife subsequently adopted the victim when she was about seven years old. In the fall of 1995, the victim began to communicate with her biological mother, who is the sister of the defendant's wife. The victim did not

---

[2] General Statutes § 53a-73a (a) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when: (1) Such person intentionally subjects another person to sexual contact who is (A) under fifteen years of age . . . ."

[3] General Statutes (Rev. to 1995) § 53-21, as amended by Public Acts 1995, No. 95-142, § 1, provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . . shall be guilty of a class C felony."

get along well with her adoptive mother and expressed a desire to live with her biological mother. She thought this would be possible if she were removed from her parents' home.[4]

The victim developed behavioral problems that intensified when she was in the seventh grade. In particular, the victim had difficulty coping with her anger and with limits imposed on her, and she had difficulty telling the truth. She sometimes destroyed personal property belonging to others. On one occasion, she "trashed" her parents' home and lied to a neighbor to obtain transportation to another part of town. She had difficulties with her classmates and refused to go to school. During the 1996 spring semester, her parents enrolled her in a special school in which she was able to receive psychological counseling in addition to academic instruction. In February, 1996, the victim became angry with her mother for not permitting her to have a party and assaulted her mother. The victim threatened suicide and, for a brief period of time, received in-patient treatment at the child and adolescent psychology department of Mount Sinai Hospital (Mount Sinai). The special school provided the victim and her parents with family therapy with a clinical psychologist assigned to the victim. As part of the family therapy, the victim and her parents entered into a behavioral contract. Because the victim and her mother argued a great deal, the family agreed that the defendant should deal with the victim if she failed to comply with the behavioral contract.

In March, 1996, the victim told her peers at her new school that the defendant had sexually abused her. According to the victim's psychologist, who learned of the reported abuse second hand, the victim first complained about the defendant's behavior when she

---

[4] Throughout the remainder of this opinion, the words parent(s) or mother refer to the defendant or his wife, the victim's adoptive parents.

was asked to confront her inappropriate behavior toward her peers. The psychologist held a family conference to discuss what she understood to be inappropriate boundaries in the family home, e.g., the defendant's touching himself and "mooning" the victim. During the conference, the victim alleged that the defendant had inserted his finger into her vagina. The psychologist then made a sexual abuse report to the department and to the police.

The defendant was arrested in July, 1996, and charged in a second, amended long form information with one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), two counts of risk of injury to a child in violation of § 53-21, one count of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A) and two counts of sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A).

With respect to the charges of which the defendant was convicted, the victim, who was then fifteen years old, testified that the defendant had fondled her breasts when he applied lotion to her sunburned back and again when he applied lotion to a rash on her torso. When he testified, the defendant admitted that on different occasions he had applied lotion to sunburn on the victim's back and to a rash on the victim's torso, including her chest and the sides of her breasts, but he denied that he had touched her nipples or touched the victim in a sexual manner. The theory of defense to the victim's allegations was that the victim had fabricated the allegations of sexual abuse so that she could move out of her parents' home and live with her biological mother.

On January 8, 1999, the jury convicted the defendant of one count of sexual assault in the fourth degree for intentional contact with the breasts of a person less than fifteen years old in violation of § 53a-73a (a) and

one count of risk of injury to a child in violation of § 53-21. He was acquitted of the other charges. The defendant received a total effective sentence of ten years incarceration, suspended after six years, and five years probation. The defendant thereafter appealed to this court.

I

## CONSTITUTIONAL CLAIMS

On appeal, the defendant claims that he was denied a fair trial because he was deprived of the right to present a defense and the right to confront witnesses in violation of the sixth and fourteenth amendments to the United States constitution, and article first, § 8, of the constitution of Connecticut.[5] The defendant raises five claims under this constitutional banner, although most of them are merely evidentiary in nature. The defendant claims that (1) the state and the trial court failed to disclose exculpatory material to him in a timely manner in violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), (2) the court improperly failed to disclose in a timely fashion two sets of documents containing exculpatory materials pursuant to an in camera review, (3) the court improperly excluded from evidence portions of a narrative allegedly written by the victim and (4) the court improperly admitted hearsay testimony from the victim's friends. We disagree.

A

The following facts are relevant to our resolution of the defendant's *Brady* claims, which concern two sets

---

[5] We resolve the defendant's claims on federal constitutional grounds because the defendant did not brief his state constitutional claims separately. See *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992) (tools of analysis to be used to construe contours of state constitution). Claims that are not briefed are deemed abandoned. *State* v. *Salvatore*, 57 Conn. App. 396, 401, 749 A.2d 71, cert. denied, 253 Conn. 921, 755 A.2d 216 (2000).

of documents, specifically a portion of the victim's Mount Sinai records and notes taken by the state police trooper (trooper) who interviewed the victim as part of the investigation of alleged sexual abuse. Prior to trial, the defendant's counsel wrote to the prosecutor, requesting, pursuant to Public Acts 1998, No. 98-70,[6] that the prosecutor review the victim's juvenile files and that the state disclose any *Brady* material to the defendant. Shortly thereafter, the defendant filed a motion in limine with the court, asking it to conduct an in camera review of all the victim's psychological and psychiatric records subpoenaed by the defendant, and to disclose to him any records that related to the victim's ability to tell the truth or that demonstrated the victim's prejudice and hostility toward the defendant. The defendant also asked the court to disclose any records that constituted *Brady* material as a result of any support in that material for exculpatory explanations or alternative motives for the victim's allegations. The court conducted an in camera review of the victim's psychiatric and psychological records, but did not order the records at issue disclosed to the defendant prior to trial.

At trial, after the victim had testified, the state presented the testimony of the victim's school psychologist, who also had participated in the victim's treatment at Mount Sinai. While the defendant was cross-examining the psychologist, he learned that the state had permitted the psychologist to review the victim's Mount Sinai progress notes prior to testifying. Until that time, the defendant had not seen the progress notes. The court ordered the state to provide the defendant with

---

[6] Public Acts 1998, No. 98-70, has been codified in part in General Statutes § 46b-124 titled "Confidentiality of records of juvenile matters. Exceptions," and in General Statutes § 17a-28 titled "Definitions. Confidentiality of and access to records; exceptions. Procedure for aggrieved persons. Regulations."

a copy of the records and told the defendant that he could recall the victim for further cross-examination.

By oral motion, the defendant subsequently asked the court to dismiss the charges against him pursuant to *Brady* because the state had failed to disclose the records. The records contained numerous references by the psychologist and personnel at Mount Sinai regarding the victim's truthfulness and motivation. The defendant contended that he was prejudiced by not having had the records at the time he cross-examined the victim about her veracity and motivation.

The court denied the *Brady* motion, concluding that the state had not withheld the records because the court itself had conducted an in camera review of the records and disclosed to the defendant what appeared at the time to be exculpatory material.[7] The court explained that it could not have known that some of the records were exculpatory until the victim had testified and the subject was placed in controversy.

The second set of documents came to the defendant's attention while the trooper was testifying. The trooper had interviewed the victim on June 3, 1996, and took notes from which she generated a report. The report came to light during the prosecutor's direct examination of the trooper. The prosecutor gave defense counsel a copy of the report during trial and provided him with a copy of the trooper's notes when directed to do so by the court. The defendant again moved for a *Brady* disciplinary dismissal of the charges against him because the state had failed to produce the report and notes prior to the time the victim testified. The defen-

---

[7] In ruling, the court stated: "As you said, if I'm wrong and the case results in a conviction, goes up on appeal, the Appellate Court will review what I did to see if I was wrong. I did the best I could under the circumstances. I made a fair and open review of the documents, so if anyone's going to take the responsibility on this, it's me, not the state's attorney's office, and I think that if I'm wrong, it's subject to review."

dant claimed that the notes revealed that the victim inconsistently reported how, when and where certain events took place.

Before we analyze the defendant's claims with respect to each set of documents, we briefly repeat the purpose of and standards controlling a *Brady* disciplinary motion. "In *Brady* v. *Maryland*, supra, 373 U.S. 87, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]." (Internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 452, 758 A.2d 824 (2000). The state's *Brady* obligation encompasses evidence affecting the credibility of a state's witness. *Giglio* v. *United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Napue* v. *Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). "*Brady*'s due process basis . . . requires a determination of when disclosure must be made to ensure a fair trial. . . . The unmistakable tone of *Brady* is that evidence required to be disclosed must be disclosed at a time when it can be used." (Citation omitted.) *State* v. *Pollitt*, 199 Conn. 399, 413–14, 508 A.2d 1 (1986).

We now turn to each set of documents to which the defendant's *Brady* claims apply as well as his claims that the trial court abused its discretion pursuant to its in camera review.

1

The defendant claims that the state did not disclose the progress notes concerning the victim's treatment

at Mount Sinai in a timely fashion and that the court improperly denied the defendant's motion to dismiss the charges against him pursuant to *Brady*. We conclude that there was no *Brady* violation because the decision to give the defendant the progress notes was controlled by the trial court, not by the prosecutor.

"A due process violation occurs under *Brady* only if the *prosecution* withholds material evidence favorable to a defendant." (Emphasis in original.) *State* v. *Harris*, 227 Conn. 751, 762, 631 A.2d 309 (1993). Here, the prosecutor was not free to disclose the victim's psychiatric and psychological records because they are protected by statute. As the court noted in ruling on the defendant's *Brady* motion with respect to the Mount Sinai records, the court, not the state, made the decision prior to trial not to release all of the progress notes to the defendant. Because the prosecution did not withhold material evidence, there can be no *Brady* violation with respect to the Mount Sinai records.

2

The defendant also claims that he was denied a fair trial as a result of the state's failure to turn over the state police trooper's notes concerning her interview with the victim. The notes came to the defendant's attention during the state's direct examination of the trooper. The defendant, again by oral motion, asked the court to dismiss the charges against him pursuant to *Brady*. The court denied the motion, but ordered the state to disclose the notes and once more gave the defendant the opportunity to recall the victim for cross-examination. The defendant declined to recall the victim to continue his cross-examination of her.[8]

---

[8] Although our analyses of the issues in parts I A 1 and 2 are sufficient to resolve the defendant's *Brady* claims, we have not addressed the fact that the defendant failed to recall the victim to continue his cross-examination and the defendant's argument that the opportunity to recall the victim was not a viable option. With respect to the defendant's claim that the court's invitation to recall the victim did not provide him with a timely

In his brief to this court, the defendant addressed all of the inconsistencies between the trooper's notes and the victim's testimony, and how he could have used the information to impeach the victim's credibility during his cross-examination of her. We acknowledge the inconsistencies, but fail to see any harm that befell the defendant because he did not have the notes when he cross-examined the victim. None of the inconsistencies that the defendant has pointed out relate to the crimes of which he was convicted. They all pertain to the charges of which he was acquitted, and the victim's testimony alone related to those charges. The notes therefore did not contain exculpatory information that was material to the defense, and the defendant's claim fails under the third prong of *Brady*.[9]

opportunity to cross-examine the victim, the defendant argued that recalling the victim would have created the impression in the eyes of the jury that she was once again being victimized by him. This argument only supports the state's argument and this court's conclusion that the defendant sufficiently had cross-examined the victim following her direct testimony and that additional cross-examination by the defendant would have elicited cumulative evidence. As the record has revealed to us, the defendant thoroughly questioned the victim about her veracity, motives and feelings about her parents and her biological mother. The trial court frequently sustained the state's objections to the defendant's questions to the victim on an "asked and answered" basis. We therefore conclude that after he had an opportunity to review the Mount Sinai progress reports and the trooper's notes, the defendant himself realized that there was no new territory to explore with the victim and that to reexamine her with regard to issues into which he already had delved may have aroused the jury's sympathy for the victim. The defendant made a tactical decision not to recall the victim to cross-examine her about matters to which she and others had already testified. As our analyses explain, the defendant was not harmed by his decision. See also *State* v. *Berube*, 256 Conn. 742, 748–49, 775 A.2d 966 (2001) (discussing waiver of constitutional rights based on trial strategy).

[9] In their briefs to this court, the parties make reference to the state's "open file" policy and the defendant's access to the file. The parties disagree as to whether the trooper's report and notes were in the file. We need not determine whether the notes were in the file, but we take this opportunity to remind "parties not to consider implementation of an open file policy as satisfaction of the defendant's discovery requests or the state's constitutional obligation to disclose exculpatory materials." *State* v. *Wilcox*, supra, 254 Conn. 453 n.19.

## B

The defendant claims that the court improperly failed to disclose in a timely fashion, following an in camera review, documents containing exculpatory materials. The documents concern the victim's Mount Sinai records and her counseling records, and a social worker's notes. We review each claim in turn.

### 1

The defendant filed a motion asking the court to conduct an in camera review of the Mount Sinai records for exculpatory material. Prior to trial, the court did not disclose certain portions of the victim's Mount Sinai progress reports. At trial, after he had received and reviewed a copy of the progress notes, the defendant thought that they contained exculpatory material when viewed from the perspective of the defense, i.e., the victim fabricated the allegations of the defendant's sexual abuse with the hope of being removed from her parents' home and reunited with her biological mother.

"A criminal defendant has a constitutional right to cross-examine the state's witnesses, which may include impeaching or discrediting them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception. . . . Thus, in some instances, otherwise privileged records . . . must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility." (Citations omitted.) *State* v. *Slimskey*, 257 Conn. 842, 853–54, 779 A.2d 723 (2001). "A lack of knowledge about the credibility of a witness involves the constitutional right of confrontation. . . . That lack of knowledge can be ameliorated by an extensive and effective cross-examination. A lack of any knowledge at all about the existence of exculpatory material can never be cured."

(Citation omitted.) *State* v. *Leduc*, 40 Conn. App. 233, 249, 670 A.2d 1309 (1996), on appeal after remand, 44 Conn. App. 744, 690 A.2d 1390, cert. denied, 241 Conn. 909, 695 A.2d 541 (1997).

"The need to balance a witness' statutory privilege to keep psychiatric records confidential against a defendant's rights under the confrontation clause is well recognized. See, e.g., *State* v. *Herring*, 210 Conn. 78, 108–109, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989). The test and the associated burdens imposed on a defendant are equally well chronicled. 'If, for the purposes of cross-examination, a defendant believes that certain privileged records would disclose information especially probative of a witness' ability to comprehend, know or correctly relate the truth, he may, out of the jury's presence, attempt to make a preliminary showing that there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness. . . . If in the trial court's judgment the defendant successfully makes this showing, the state must then obtain the witness' permission for the court to inspect the records in camera.' " *State* v. *Slimskey*, supra, 257 Conn. 855.

"Access to confidential records should be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it . . . and to weigh that value against the interest in confidentiality of the records." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 227 Conn. 762. "[T]he linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material especially probative of the ability to comprehend, know and correctly relate the truth . . . so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation." (Citation omitted;

internal quotation marks omitted.) *State* v. *Kelly*, 208 Conn. 365, 379, 545 A.2d 1048 (1988).

"Not only must the suppressed evidence be favorable to the accused, it must be material in the constitutional sense. . . . The test of materiality is whether the omitted evidence, evaluated in the context of the entire record, creates a reasonable doubt that did not otherwise exist. . . .

"It is true that [w]hen a conviction depends entirely upon the testimony of certain witnesses . . . information affecting their credibility is material in the constitutional sense since if they are not believed a reasonable doubt of guilt would be created." (Citations omitted; internal quotation marks omitted.) *State* v. *Storlazzi*, 191 Conn. 453, 461–62, 464 A.2d 829 (1983).

If, after its review, "the court discovers no probative and impeaching material, the entire record of the proceeding must be sealed and preserved for possible appellate review. . . . Once the trial court has made its inspection, the court's determination of a defendant's access to the witness' records lies in the court's sound discretion, which we will not disturb unless abused." (Internal quotation marks omitted.) *State* v. *Slimskey*, supra, 257 Conn. 856.

On the basis of our review of the victim's Mount Sinai progress notes, we conclude that portions of the progress notes contain exculpatory information with respect to the victim's perception of reality and her motivation and ability to relate the truth. The notes indicate that the victim resented the defendant's authoritarian position in her family and reveal that at the time of her disclosure, the victim was having difficulty with her peers and may have used the allegation of sexual abuse to divert attention from that issue. Furthermore, the victim questioned her ability to perceive accurately certain social situations and the effect her disclosure

may have on the defendant's career. The victim presumed that if she were removed from her parents' home, she would be reunited with her biological mother. The progress notes also reflect the victim's desire to retaliate when her feelings are hurt or she does not get her own way. In addition, the notes reflect inconsistencies in the victim's reporting of when the defendant's alleged acts of sexual abuse occurred.

"The correct inquiry for identifying harmless constitutional error is to ask whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Internal quotation marks omitted.) Id., 859.

We agree with the parties that this case depended on the jury's perception of the credibility of the victim and the defendant. The jury was aware that the victim was a troubled child. How she manifested her problems concerning the defendant was critical to the jury's assessment of the victim's claim that the defendant had sexually abused her when he applied lotion to her sunburn and again when he applied lotion to a skin rash on her torso. We conclude that the Mount Sinai progress notes may have been helpful to the defendant when he cross-examined the victim.

We cannot conclude, however, that the trial court abused its discretion by failing to disclose the progress

notes to the defendant before trial. As the court observed, it disclosed to the defendant those records that it thought pertained to the theory of defense. It noted that the value of other portions of the records could not be known until the victim testified and the subject became a point of controversy. When the specific details were brought to the court's attention, it ordered the victim's Mount Sinai progress notes released to the defendant and provided the defendant with additional time to review them. Furthermore, the court offered the defendant the opportunity to recall the victim to continue his cross-examination of the victim. Despite his claim that the Mount Sinai progress notes provided vital fodder for cross-examination of the victim, especially with respect to her credibility, the defendant made the tactical decision not to recall the victim to continue his cross-examination of her.

Furthermore, the defendant was not prejudiced by not having the Mount Sinai progress notes when he cross-examined the victim. The record before us is clear that the victim's credibility was thoroughly litigated before the jury. The victim was the first witness and she herself testified that she lied when she was in trouble and that she lied to get something she wanted. She was frank about not liking her parents and her desire to be reunited with her biological mother. The victim's psychologist and others testified about these facts as well. There was conflicting evidence about when the sexual abuse occurred and when and to whom the victim reported it. The defendant argues that he could not use the progress notes to impeach the victim directly and that he was only able to use them to impeach the victim indirectly. The defendant cites no legal authority for the difference between so-called direct and indirect impeachment, and we know of none.

The state points out that the defendant was acquitted of the victim's more serious allegations of sexual abuse.

The defendant, however, admitted that he had applied lotion to the victim's sunburn and to a rash on her torso, including her chest and the sides of her breasts. The issue on which the jury had to focus therefore was not solely the victim's credibility, but whether the defendant intentionally subjected the victim to sexual contact. See General Statutes § 53a-73a. The defendant's credibility itself was therefore a key issue.

We therefore conclude that the trial court did not abuse its discretion by not releasing the Mount Sinai progress notes to the defendant prior to trial and that the defendant was not denied a constitutional right to present his defense or to confront witnesses against him by not having the records at the time the victim testified.

2

The defendant also claims that the trial court deprived him of his right to confrontation and abused its discretion with respect to its in camera review of the victim's psychiatric and counseling records and notes of social workers that were probative of the victim's capacity to relate the truth. The records at issue were marked court exhibit six for identification. The same standards that apply to the victim's Mount Sinai records apply here. See part I B. On the basis of this court's in camera review of the subject records, we conclude that the trial court did not abuse its discretion by not disclosing all of the records in court exhibit six to the defendant.

On cross-examination, the defendant attacked the victim's ability to tell the truth. On direct examination, as well as on cross-examination, the victim admitted that she often lied, particularly to get out of trouble or to get what she wanted. Personnel from the victim's special school and Mount Sinai Hospital also testified that the victim had difficulty telling the truth. There was a substantial amount of evidence before the jury

that the victim was a liar. The defendant's claim that he did not have enough material to attack her credibility therefore is disingenuous. The records he was seeking were cumulative of evidence already before the jury; the victim often lied to her parents and others. She was sent to a special school, in part, because of her inability to tell the truth. By failing to disclose all of the records in court exhibit six, the court did not inhibit the defendant's right to cross-examine the victim. The jury's verdict demonstrates that the defendant successfully discredited the victim's testimony in part. The defendant was not convicted of any crimes of sexual abuse about which only the victim testified. The defendant's conviction was based on the physical contact that the defendant admitted had occurred, i.e., he applied lotion to the victim's breasts. The jury assessed the testimony of both the victim and the defendant for credibility to determine whether the defendant had touched the victim's breasts for sexual purposes. The victim's credibility was not an issue with respect to the fact of that contact, which constituted an element of the crimes of which the defendant was convicted. Because the defendant admitted that he touched the victim's breasts, the jury was free to believe the victim that the defendant's touching her was for his sexual gratification.

C

The defendant's next claim that he was denied a fair trial concerns the trial court's refusal to admit into evidence portions of a diary narrative allegedly written by the victim. The material in the narrative concerned the victim's behavior with a boy of her own age two to three years after the events that gave rise to the charges against the defendant. The defendant sought to have the narrative introduced into evidence so that he could ask the victim whether the events described in the narrative were true or fabricated. The narrative described the boy's rubbing the victim's feet and applying lotion

to her stomach. The defendant wanted to examine the victim with respect to these activities because they concerned conduct similar to the allegations of sexual abuse that the victim had made against the defendant.

Setting aside the question of whether the defendant would be able to lay the proper foundation for the narrative to be admitted, as the trial court did, we agree with the court that the subject was not a proper one for inquiry. The state objected to the introduction of the narrative on the basis of the so-called rape shield statute. General Statutes § 54-86f. The court denied the admission of the narrative on two grounds: (1) the victim's credibility had been explored "freely and openly," and further inquiry would be "unnecessarily repetitive," and (2) the victim's sexual activities fell under the privilege of the rape shield statute.

At trial, the defendant did not take issue with the court's reasoning regarding the rape shield statute. On appeal, the defendant argues that the protection afforded by the rape shield statute concerns past conduct, not subsequent conduct, but cites no authority for that proposition. "It is well settled that the trial court can be expected to rule only on those matters that are put before it. . . . With only a few exceptions . . . we will not decide an appeal on an issue that was not raised before the trial court. . . . To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." (Citations omitted; internal quotation marks omitted.) *State* v. *Rodriguez*, 61 Conn. App. 700, 713, 767 A.2d 756 (2001). The defendant did not raise at trial the claim that the rape shield statute applies only to prior sexual conduct. We therefore decline to review the defendant's claim.

D

The defendant's fourth claim is that the trial court deprived him of the constitutional right to confront

witnesses by admitting hearsay testimony under the constancy of accusation or prior consistent statement exceptions to the hearsay rule. We disagree.

The following facts are relevant to this claim. During the state's case, the victim testified that she may have told two of her friends of the defendant's abuse and that she confided in her friends after she disclosed the incidents of abuse to school personnel. She also testified that she later retracted the accusations she made to her friends. The state sought to present the testimony of three of the victim's friends and made an offer of proof. The defendant objected, arguing that none of the friends' testimony should be admitted because the requirements for constancy of accusation testimony enunciated in *State* v. *Troupe*, 237 Conn. 284, 304–305, 677 A.2d 917 (1996) (en banc), had not been met. The victim testified that she had told two of her friends after she disclosed the abuse at the special school. She did not testify that she had told the third friend. The state argued that the testimony of the victim's friends was admissible under the prior consistent statement exception to the hearsay rule to rebut the defense claim of recent fabrication. The trial court recognized that the defendant had attempted to impeach the victim's credibility, claiming that the victim had fabricated the allegations of sexual abuse because the defendant and his wife had sent the victim to the special school. The court also noted that the victim had admitted that she was not good at remembering when events occurred. The court admitted the testimony of the victim's friends as prior consistent statements to permit the jury to determine whether the victim's allegations of sexual abuse were a recent fabrication.[10]

---

[10] In admitting the testimony of the victim's three friends into evidence, the trial court stated: "I'll assume from what I've heard from [the assistant state's attorney] that all three of these girls will relate some conversations with [the victim] in 1994 or 1995. . . . Sometime prior to 1996 in which, allegedly, [the victim] told them that her father was doing something to her, a specific act or acts that was arguably sexual in nature. . . . And there

Three of the victim's friends testified that the victim had confided in them during the sixth grade or at the beginning of the seventh grade, in 1994 or 1995. The victim's friends all testified in accordance with the victim's testimony with respect to her allegations of sexual abuse. When she confided in them, the victim asked each of her friends not to tell anyone.

1

The defendant first asks this court to abandon the constancy of accusation doctrine as modified by our Supreme Court in *State* v. *Troupe,* supra, 237 Conn.

has been a substantial amount of evidence in this case that—offered in the case—that [the victim] may have made up this disclosure in 1996 because of a fight she had with her mother, the admission into the CAPS unit, the trashing, as it has been referred to, of the house and the lying incidents and getting in trouble, and that somehow she was reacting to that so she makes up this story to get her father in trouble.

\* \* \*

"So, it would seem to me that the question, then, is whether or not the court should allow either prior consistent statements or some sort of prior reporting of these sexual acts before the time, times that she allegedly was reacting to the fight with the mother, the trashing of the house, the admission into the CAPS unit.

\* \* \*

"It seems to me that we certainly—we're in a difficult area here, but I think that there has been enough evidence introduced in this case for the jury to make a finding if they choose to believe the evidence that [the victim] created these allegations out of whole cloth sometime in 1996 in response to certain things that were happening in her life at that time between herself and her parents.

"Therefore, if there were statements that she made to people prior to that, that would indicate that these things happened. I think it is something the jury should consider to determine whether or not [the victim] had discussed this with anyone before. [The victim] certainly testified that she had a bad memory when it came to a lot of conversations she had with a lot of people. So, the fact that she didn't remember telling this to people, although she did remember something about [one of her friends], and she said that she may have told her friends from [a neighboring town], she wasn't clear on that; I think is immaterial. I think this is proper evidence for a jury to consider and make a determination of whether or not she's making up these allegations or these allegations are true, so I will allow it from either two or three of these witnesses . . . ."

304–305, claiming that three other jurisdictions have done so.[11] Although we conclude that *Troupe* does not apply to the facts of this case, we note that it is not within the province of an intermediate appellate court to overrule the Supreme Court. *Hanes* v. *Board of Education*, 65 Conn. App. 224, 230 n.6, 783 A.2d 1 (2001); see *State* v. *Otero*, 49 Conn. App. 459, 468 n.9, 715 A.2d 782, cert. denied, 247 Conn. 910, 719 A.2d 905 (1998).

2

As to the evidentiary aspect of the defendant's claim, we review the trial court's rulings with regard to hearsay matters under an abuse of discretion standard. *State* v. *McNair*, 54 Conn. App. 807, 811, 738 A.2d 89, cert. denied, 251 Conn. 913, 739 A.2d 1249 (1999). The trial court's rulings on evidentiary matters "will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998).

The defendant's first claim is that the testimony of the victim's friends was not admissible under *Troupe*. "[A] person to whom a sexual assault victim has reported the assault may testify only with respect to the fact and timing of the victim's complaint . . . . Before the evidence may be admitted . . . the victim must first have testified concerning the facts of the sexual assault and the identity of the person or persons to whom the incident was reported." *State* v. *Troupe*, supra, 237 Conn. 304–305. The defendant argues that the court should not have admitted the testimony of the third friend because the victim did not testify that she had confided in the third friend. The state notes that this claim is unpreserved because the defendant did not raise the objection at trial. We agree that the

---

[11] See the concurring opinion of Judge Dranginis.

claim as to the third friend was not preserved. Furthermore, after reviewing the trial transcript, we conclude that the court did not admit the testimony of the victim's friends pursuant to the constancy of accusation doctrine and therefore *Troupe* does not apply.

3

We now consider whether the trial court properly admitted the testimony of the victim's three friends under the prior consistent statement exception to the hearsay rule. This is an evidentiary claim, not one of constitutional magnitude.[12] See *State* v. *Robinson*, 227 Conn. 711, 741 n.22, 631 A.2d 288 (1993).

"The general rule is that a party cannot strengthen the testimony of his own witness by showing that he made previous statements to the same effect as his testimony . . . . [This court] recognized in *Thomas* v. *Ganezer*, 137 Conn. 415, 78 A.2d 539 [(1951)], that prior consistent statements may be admitted in certain limited situations and that the determination of this issue is left to the discretion of the trial court. . . . Under appropriate circumstances, a prior statement, consistent with a witness' testimony, may be admitted after introduction of an inconsistent statement. . . . There is an important qualification appended to this rule: When a prior consistent statement is received . . . under the principle we have applied, it is admitted to affect credibility only, not to establish the truth of the statement." (Citations omitted; internal quotation marks omitted.) *State* v. *McCarthy*, 179 Conn. 1, 18, 425 A.2d 924 (1979).

"If the credibility of a witness is impeached by (1) a prior inconsistent statement of the witness, (2) a sug-

---

[12] "It is well established that [r]obing garden variety claims of [an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature." (Internal quotation marks omitted.) *State* v. *Hansen*, 39 Conn. App. 384, 390, 666 A.2d 421, cert. denied, 235 Conn. 928, 667 A.2d 554 (1995).

gestion of bias, interest or improper motive that was not present at the time the witness made the prior consistent statement, or (3) *a suggestion of recent contrivance*, evidence of a prior consistent statement made by the witness is admissible . . . ." (Emphasis added.) Conn. Code Evid. § 6-11 (b); see also *State* v. *Valentine*, 240 Conn. 395, 413–14, 692 A.2d 727 (1997). "Impeachment on the ground of recent contrivance . . . is more nearly connected with the case of impeachment by self-contradiction. The charge of recent contrivance is usually made, not so much by affirmative evidence, as by negative evidence that the witness did *not* speak of the matter before, at a time when it would have been natural to speak; his silence then is urged as inconsistent with his utterances now, i.e., as a self-contradiction . . . . The effect of the evidence of consistent statements is that the supposed fact of not speaking formerly, from which we are to infer a recent contrivance of the story, is disposed of by denying it to be a fact, inasmuch as the witness did not speak and tell the same story . . . . [4 Wigmore, Evidence (Chadbourn Rev. 1972) § 1129, pp. 270–71]." (Internal quotation marks omitted.) *State* v. *Dolphin*, 178 Conn. 564, 568 n.5, 424 A.2d 266 (1979).

Here, the court properly exercised its discretion in permitting the victim's friends to testify with respect to her confidences that the defendant had been abusing her. The theory of defense was that the victim recently fabricated the allegations of sexual assault against the defendant because she had gotten into trouble with her mother and her parents had sent her to a special school. The defense theory invited the testimony of the victim's friends to rehabilitate her credibility, not to prove the truth of the matters asserted therein.

Even if we assume for the sake of argument that the court improperly permitted the victim's friends to testify, the defendant has not met his burden of demonstrating how the testimony of the victim's friends

harmed him. "In nonconstitutional claims, the defendant has the burden of demonstrating the harmfulness of the claimed error. . . . He must show that it is more probable than not that the claimed error affected the verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Walsh*, 52 Conn. App. 708, 720, 728 A.2d 15, cert. denied, 249 Conn. 911, 733 A.2d 233 (1999). The testimony of the victim's friends was consistent with the defendant's own testimony that he applied lotion to the victim's back to treat sunburn and to her torso, including the sides of her breasts, to treat a rash. The defendant was acquitted of other charges about which the victim's friends did not testify.

4

The defendant also claims that the court violated his constitutional rights when it permitted an investigator from the department to testify about the victim's reports of sexual abuse made the day after the family counseling session. Again, we note that this is an evidentiary claim and not one of constitutional magnitude.

At trial, the parties argued whether the investigator should be permitted to testify about the statements of sexual abuse the victim made to the investigator during the course of her interview. We need not determine whether the court improperly admitted the hearsay testimony under the constancy of accusation doctrine or the prior consistent statement exception to the hearsay rule because the defendant has not demonstrated that he was harmed by the admission of the investigator's testimony. See *State* v. *Green*, 55 Conn. App. 706, 710, 740 A.2d 450 (1999) (court did not reach issue of whether admission of testimony was proper upon determining defendant not harmed by testimony), cert. denied, 252 Conn. 920, 744 A.2d 438 (2000). He was acquitted of all charges except those related to the conduct that he admitted. The jury assessed his credibil-

ity as to whether he applied lotion to the victim and whether he had any improper motive in so doing.

## II

## EVIDENTIARY CLAIMS

The defendant claims that the trial court abused its discretion in refusing to admit into evidence letters from the victim's foster parents to department employees. Although we conclude that the court abused its discretion in refusing to admit the records, the improper ruling was harmless.

The following facts relate to this claim. After the victim disclosed the defendant's sexual abuse, she was removed from her parents' home by the department and placed in foster care. She was placed in a number of foster homes, including one in Florida. Her foster mother in Florida wrote letters about the victim to the department case manager in Connecticut. At trial, the defendant sought to put into evidence, under the business record exception to the hearsay rule, a number of letters from the victim's foster mother because they concerned the victim's credibility. The court refused to admit the letters, which were part of the department's file, pursuant to the business record exception to the hearsay rule.

"To be admissible under the business record exception of General Statutes § 52-180, the business record must be one based upon the entrant's own observations or upon information transmitted to him by an observer whose business duty it was to transmit it to him." (Internal quotation marks omitted.) *In re Barbara J.*, 215 Conn. 31, 40, 574 A.2d 203 (1990). Our General Statutes impose a duty on both the commissioner of children and families and foster parents. General Statutes § 17a-96 provides in relevant part: "The institutions having custody of such children and . . . persons licensed by

[statutory authority] . . . shall make such reports to the Commissioner of Children and Families at such reasonable times and in such form and covering such data as the commissioner directs. The commissioner and his deputy and agents shall supervise the placing of such children in foster homes. . . .'' The trial court therefore abused its discretion when it refused to admit the letters into evidence pursuant to the business record exception to the hearsay rule.

We have reviewed the letters in camera and conclude that the defendant suffered no harm as a result of the court's abuse of discretion. The letters reveal that the victim's behavior had not changed since she was placed in foster care. She continued to lie and to misbehave. The victim's lying and misbehavior were the subject of much testimony, and putting the department's records into evidence would have been cumulative. The jury was well aware of the victim's penchant for failing to tell the truth when it suited her objectives.

### III

### INSTRUCTIONAL CLAIMS

The defendants final set of claims concern the trial court's instructions to the jury, which the defendant asserts deprived him of his constitutional rights to a fair trial.[13] The defendant claims that the court improperly charged the jury (1) by failing to instruct that the factual basis of its verdict must be unanimous, (2) by failing to define sexual contact in the context of sexual assault in the fourth degree with respect to the fourth count of the information, and (3) regarding reasonable doubt and the presumption of innocence. We disagree.

[13] Although the defendant claims that his constitutional rights were violated under both the federal and state constitutions, he has failed to present a separate state constitutional analysis. We therefore resolve his claims pursuant to the federal constitution. See *State* v. *DaEria*, 51 Conn. App. 149, 165, 721 A.2d 539 (1998).

We must first determine whether the defendant properly preserved these claims for review. To preserve a claim of improper jury instruction for appellate review, an appellant must submit a request to charge to the trial court in accordance with our rules of practice or take an exception to the charge given at trial. Practice Book § 42-16; see *Pestey* v. *Cushman*, 259 Conn. 345, 372–73, 788 A.2d 496 (2002). The defendant filed a "preliminary request for jury instructions" that did not comport with the dictates of Practice Book § 42-18, and, even if the request had met those dictates, it still would purport to address only one of the issues the defendant claims on appeal, i.e., improper instruction regarding the presumption of innocence. The defendant therefore may prevail on his unpreserved claims of improper jury instruction only if he satisfies the four prongs of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[14]

"[W]e note that under . . . *Golding*, a defendant may prevail on an unpreserved constitutional claim of instructional error only if, considering the substance of the charge rather than the form of what was said, it is reasonably possible that the jury was misled. . . . In determining whether the jury was misled, [i]t is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . Furthermore, [a] jury instruction is constitutionally adequate if it pro-

---

[14] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

vides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present." (Internal quotation marks omitted.) *State* v. *Delgado*, 50 Conn. App. 159, 171, 718 A.2d 437 (1998). We turn now to the defendant's claims on appeal.

## A

The defendant's first claim is that the trial court deprived him of his due process right to a fair trial by failing to instruct the jury that the factual basis of its verdict with respect to the fourth count alleging sexual assault in the fourth degree must be unanimous. We do not agree.

The record is adequate for our review, and "[a] claim bearing on the defendant's right to a unanimous verdict implicates a fundamental constitutional right to a fair trial and is thus reviewable despite the defendant's failure to request a specific unanimity charge or to take proper exceptions." *State* v. *Famiglietti*, 219 Conn. 605, 619, 595 A.2d 306 (1991). The defendant claims that the instruction was improper because the court stated that "the defendant intentionally subjected the alleged victim to sexual contact by touching her breasts with his hands while applying sunburn lotion *and or* lotion for a rash."[15] (Emphasis added.) The defendant claims that

---

[15] The court's complete instruction as to sexual assault in the fourth degree was: "In the fourth count, the state claims the defendant is guilty of sexual assault in the fourth degree in violation of § 53a-73a, subsection (a) (1) (A), of the Connecticut General Statutes. The three elements described in connection with the third count [which also alleges sexual assault in the fourth degree] are the same three elements which the state must prove in the fourth count. To repeat those three elements, they are as follows: One, person acts intentionally, two, person subjects another person to sexual contact and, three, the other person is less than fifteen years of age.

"The only difference is that the state alleges this was a different occurrence at a different time in a different place. In this count, the term intimate parts would include the breasts of the alleged victim. The state claims the defendant intentionally subjected the alleged victim to sexual contact by touching her breasts with his hands while applying sunburn lotion and or

the court did not provide a unanimity instruction informing the jurors that they must be unanimous as to which factual basis, if not both, constituted the actus reus of the offense. He relies on *State* v. *Ostolaza*, 20 Conn. App. 40, 50, 564 A.2d 324, cert. denied, 213 Conn. 808, 568 A.2d 793 (1989), in support of his claim. The defendant's reliance is misplaced.

"In essence, the unanimity requirement as enunciated in [*United States* v. *Gipson*, 553 F.2d 453 (5th Cir. 1977)] and its progeny requires the jury to agree on the factual basis of the offense. The rationale underlying the requirement is that a jury cannot be deemed to be unanimous if it applies inconsistent factual conclusions to alternative theories of criminal liability. *State* v. *Bailey*, [209 Conn. 322, 334, 551 A.2d 1206 (1988)]. Where a trial court charges a jury that the commission of any of several alternative acts would subject a defendant to criminal liability, a unanimity charge on a specific act is required only if two conditions are met: (1) the alternative acts are *conceptually distinct* from each other; *and* (2) the state has presented *supporting evidence* on each alternative act." (Emphasis in original; internal quotation marks omitted.) *State* v. *Ostolaza*, supra, 20 Conn. App. 50. *Ostolaza* concerned the charge of risk of injury to a child, which proscribes two conceptually different types of conduct. Here, the defendant was charged with sexual assault in the fourth degree,

lotion for a rash. The state further alleges that the defendant did this for his sexual gratification and or for the purpose of degrading and or humiliating the alleged victim. The state also claims the alleged victim was under fifteen years of age at the time. The defendant claims the alleged sexual contact did not occur. He said that if he touched the victim, it was in conjunction with treating her for a rash or to treat her sunburn and any incidental touching of her breasts, if any, was merely accidental.

"If you find unanimously [that] the state has proved all three elements beyond a reasonable doubt, then you will return a guilty verdict on the fourth count. If you find the state failed to prove one or more of the elements beyond a reasonable doubt, then you will return a not guilty verdict."

which proscribes sexual contact with a victim who is younger than fifteen years of age. The defendant was charged with unlawful sexual contact with the victim's breasts. There is no conceptually alternative theory as to how the statute could be violated notwithstanding the state's presentation of evidence of two different occasions on which the defendant unlawfully touched the victim's breasts.

Furthermore, the transcript reveals that the court in fact charged the jury that its verdict must be unanimous as to each count. The court charged the jury that "[i]f there are options under the statute as to how a certain crime might be committed, the jury must be unanimous as to how it was committed to return a guilty verdict." The defendant's claim of constitutional violation therefore clearly does not exist.

### B

The defendant's second claim is that the court did not define sexual contact with regard to the charge of sexual assault in the fourth count and thereby relieved the state of its burden of proving every element of sexual contact. We disagree.

A portion of the court's charge as set forth in footnote 15 is at issue. Specifically, the defendant takes issue with the following language of the charge: "In the fourth count . . . [t]he three elements described in connection with the third count [which also alleges sexual assault in the fourth degree] are the same three elements which the state must prove in the fourth count. . . . In this count, the term intimate parts would include the breasts of the alleged victim." With regard to the third count, the court defined sexual contact as follows: "In the third count, the alleged sexual contact involved a claim that the defendant touched the intimate parts of the alleged victim. This type of sexual contact is defined by statute as any contact with the intimate

parts of a person who is not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating the other person."

The trial court's failure to instruct the jury adequately as to the elements of a crime may result in a due process violation implicating the fairness of the trial. See *State* v. *Anderson*, 212 Conn. 31, 36, 561 A.2d 897 (1989); *State* v. *Dunbar*, 37 Conn. App. 338, 342, 656 A.2d 672, cert. denied, 233 Conn. 906, 657 A.2d 644 (1995). We will review the claim because the record is adequate and the claim is of constitutional magnitude.

The defendant claims that the manner in which the court instructed the jury with respect to the fourth count, by making reference to an instruction as to the third count, made it reasonably possible that the jury was misled as to the definition of sexual contact. He cites no authority for his claim and we are aware of none. We have read the court's charge as to the fourth count in its entirety and conclude that it is not reasonably possible that the jury was misled. The court stated that the victim's vagina was the intimate part referred to in the third count and that her breasts were the intimate parts referred to in the fourth count. The defendant's claim therefore fails to meet the requirements of *Golding*'s third prong.

C

The defendant's last claim of improper jury instruction concerns language and sentences taken out of context regarding reasonable doubt and the presumption of innocence. The defendant claims that it was reasonably possible that the jury was misled and believed that the defendant was required to prove his innocence.[16] We are not persuaded.

---

[16] After the defendant filed his brief, the state filed a motion for rectification of the record due to a transcription error. The courtroom monitor acknowledged the mistake, and the trial court granted the motion for rectification. The defendant therefore has withdrawn that aspect of his claim.

In his brief, the defendant set out a portion of the court's charge on the burden of proof and inferences that may be drawn from the facts, and highlighted certain language isolated from the rest of the charge. The defendant dissected the language at issue from three pages of the court's jury instructions.[17]

[17] The instructions that the defendant claims were improper are emphasized in the following portion of the court's charge:

"The state, in other words, can sustain the burden resting upon it only if the evidence before you establishes the existence of every element constituting the crime charged beyond a reasonable doubt.

"The phrase reasonable doubt has no technical or unusual meaning. You can arrive at the real meaning of it by emphasizing the word reasonable. A reasonable doubt is a doubt for which a valid reason can be assigned. It is a doubt which is something more than a guess or surmise. It is not conjecture. A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising doubts, nor is it a doubt suggested by any of the jurors which is not justified by the evidence or the lack of evidence.

"A reasonable doubt, in other words, is a real doubt, an honest doubt, one that is based on reason and not merely the *possibility of innocence*, and it grows out of the evidence or the lack of evidence in the case.

"Any doubt other than this is not reasonable. It is not a hesitation arising from any feelings of sympathy or pity for the accused or his family or for any other person or persons who might in any way be affected by the decision. A reasonable doubt is one that is reasonable in light of all the evidence, and one that is honestly entertained by a juror after thorough evaluation and careful examination of all of the evidence in this case.

"It is a doubt for which you can in your own minds consciously find a valid reason. Absolute certainty, of course, in the affairs of life is almost never attainable, and the law does not require the state to prove the accused guilty with absolute certainty in order for you to return a verdict of guilty. The state does not have to prove guilt beyond all doubt or to a mathematical or absolute certainty.

"What the law does require before a jury returns a verdict of guilty is proof beyond a reasonable doubt, and this reasonable doubt is one which reasonably arises from the evidence or the lack of evidence in the case. Therefore, if after hearing all of the evidence, there is something in that evidence or the lack of evidence which leaves in the minds of the jury as reasonable men and women a reasonable doubt in the guilt of the accused, then the accused must be given the benefit of this doubt and found to be not guilty. Proof beyond a reasonable doubt is proof which precludes every reasonable hypothesis except [that] which is consistent with guilt and is inconsistent with all other reasonable conclusions. *If you can, in reason, reconcile all the facts proved with any reasonable theory consistent with the innocence of the accused, then you cannot find the defendant guilty.*

This court and our Supreme Court have stated repeatedly the standard by which we analyze claims of improper jury instructions. "In determining whether a trial court's charge satisfies constitutional requirements, however, individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules

"*It necessarily follows that if all the evidence and the reasonable and logical inferences drawn from the evidence bears equally two ways, one toward innocence and the other toward guilt, you must give it that direction which tends toward innocence.*

"If the facts that you find proven or the evidence you deem credible is consistent with or may be reasonably explained by any hypothesis other than that the accused is guilty, you must return a verdict in favor of the accused.

"Our statute provides that a person acts intentionally with respect to a result or to a conduct described by the statute defining an offense when his conscious objective is to cause the result or to engage in conduct. Intentional conduct is purposeful conduct rather than conduct that is accidental or inadvertent. Clearly, intent is a mental process, but intention often can only be proven by the actions and statements of the person whose act is being examined.

"No one is expected to come into court and testify that they looked into another person's mind and saw there a certain intention. It is often impossible and never necessary to prove criminal intent by direct evidence. Intent may be proven by circumstantial evidence, as I have previously explained to you. Therefore, one way in which the jury can determine what a person's intention was at a given time is first by determining what that person's conduct was, including any statements that person made and what the circumstances were surrounding that conduct and then from that conduct and circumstances inferring that the person's intention was what the person's intention was so long as, one, the underlying circumstances or facts. are reasonable, are established beyond a reasonable doubt, and, two, the inferences to be drawn are reasonable and logical and not the result of speculation, and three, the jury is satisfied that the fact or circumstances to be inferred have been proven beyond a reasonable doubt.

"In other words, *intention may be inferred from a person's conduct. You may infer from the fact that the accused engaged in certain conducts that the accused intended to engage in that conduct.* This inference is not a necessary one. That is, you are not required to infer intent from the conduct of the accused but *it is an inference that you may draw if you find it reasonable and logical.*" (Emphasis added.)

of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Internal quotation marks omitted.) *State* v. *Walsh*, 67 Conn. App. 776, 798, 789 A.2d 1031, cert. denied, 260 Conn. 906, 795 A.2d 546 (2002).

A jury instruction must be "considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Reid*, 254 Conn. 540, 559, 757 A.2d 482 (2000). "While the instructions need not be exhaustive, perfect or technically accurate, they must be correct in law, adapted to the issues and sufficient for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Clark*, 68 Conn. App. 19, 29, 789 A.2d 549, cert. granted on other grounds, 260 Conn. 906, 795 A.2d 546 (2002).

The defendant has raised four claims with respect to the challenged instructions, namely: (1) "[t]he trial court's instruction that 'a reasonable doubt . . . is one based upon reason and not merely the possibility of innocence' implied that reasonable doubt and the possibility of innocence are mutually exclusive . . . and robbed the defendant of the presumption of innocence,"

thereby requiring him to prove his innocence; (2) the court's so-called two inference instruction diluted the state's burden of proof from "beyond a reasonable doubt to a preponderance of the evidence standard"; (3) "[t]he charge that 'the law is made to protect society and a person whose guilt has not been established beyond a reasonable doubt, and not to protect those whose guilt has been established beyond a reasonable doubt' undermined the presumption of innocence"; and (4) "[t]he trial court failed to instruct the jury that the state must prove the element of intent beyond a reasonable doubt." We are not persuaded.

On the basis of our review of the court's entire charge, we conclude that when the charge is read in its entirety, it is not reasonably possible that the jury was misled and no injustice has occurred. Our Supreme Court upheld an instruction that a " 'reasonable doubt is a doubt based upon reason, not on the mere possibility of innocence' " in *State* v. *Blackman*, 246 Conn. 547, 560–61, 716 A.2d 101 (1998), pursuant to review under *State* v. *Golding*, supra, 213 Conn. 239–40. Our Supreme Court has also held that the two inference instruction is not constitutionally impermissible if the state's burden of proof is properly explained in the charge as a whole. See *State* v. *Griffin*, 253 Conn. 195, 208, 749 A.2d 1192 (2000), citing *State* v. *Smith*, 219 Conn. 160, 166–67, 592 A.2d 382 (1991), and *State* v. *Dyson*, 217 Conn. 498, 503–504, 586 A.2d 610 (1991).

As to the defendant's claim that the court undermined the presumption of innocence when it instructed the jury that "the law is made to protect society and a person whose guilt has not been established beyond a reasonable doubt, and not to protect those whose guilt has been established beyond a reasonable doubt," our Supreme Court has held that where the charge viewed as a whole properly apprised the jury of the state's burden of proof, the charge is not constitutionally

improper. *State* v. *Schiappa*, 248 Conn. 132, 167–77, 728 A.2d 466 (en banc), cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). On the basis of the holding in *United States* v. *Doyle*, 130 F.3d 523 (2d Cir. 1997), the *Schiappa* court exercised its supervisory powers and instructed trial courts in the future not to use the challenged language. *State* v. *Schiappa*, supra, 175. Our Supreme Court's supervisory directive, however, cannot be applied to this case, in which the jury instruction was given almost three months prior to the decision in *Schiappa*.

With respect to the defendant's claim that the court failed to charge the jury that it must prove the element of intent beyond a reasonable doubt, our review of the court's charge discloses that the court instructed the jury with respect to the third count that "[t]his statute has three elements which the state must prove beyond a reasonable doubt which are one, the person acted intentionally . . . ." When the court instructed the jury on the elements of the fourth count it stated in part: "The three elements described in connection with the third count are the same three elements which the state must prove in the fourth count. To repeat those three elements, they are as follows: One, person acts intentionally . . . . If you find unanimously [that] the state has proved all three elements beyond a reasonable doubt, then you will return a guilty verdict on the fourth count." In light of the foregoing, we conclude that the court's instruction did not amount to a clear constitutional violation and, accordingly, the defendant was not deprived of a fair trial.

The judgment is affirmed.

In this opinion LAVERY, C. J., concurred.

DRANGINIS, J., concurring. I concur with the majority opinion, but write separately to address at greater length the defendant's claim that Connecticut's con-

stancy of accusation doctrine, as modified by *State* v. *Troupe*, 237 Conn. 284, 304–305, 677 A.2d 917 (1996) (en banc), should be abandoned. In support of his claim, the defendant cites three cases from other jurisdictions that he *claims* have abandoned the doctrine: *People* v. *Brown*, 8 Cal. 4th 746, 883 P.2d 949, 35 Cal. Rptr. 2d 407 (1994) (en banc), *Commonwealth* v. *Licata*, 412 Mass. 654, 591 N.E.2d 672 (1992), and *State* v. *Hill*, 121 N.J. 150, 578 A.2d 370 (1990) (en banc).

Contrary to the defendant's claim, none of the cases he cites from other jurisdictions has abandoned what is known in those jurisdictions as the fresh complaint rule.[1] New Jersey[2] and California[3] have modified the

[1] In *Troupe*, our Supreme Court traced the origins of the constancy of accusation doctrine to the fresh complaint rule. "The fresh complaint doctrine evolved as a response to the common-law requirement of hue and cry. Victims of violent crimes were expected to cry out immediately and alert their neighbors that they had been violently assaulted. The neighbors could then initiate a collective search for the aggressor. The hue and cry also served to dispel any suspicion that the victim had been somehow involved or complicit in the crime. . . . Trial courts required full details of the victim's complaint as a necessary element of the prosecution's case in those instances of violence. . . .

"The courts applied the same hue and cry requirement in rape cases . . . . Because hue and cry was a necessary prerequisite for a court to hear a rape case, [women who had not complained] could not have their cases prosecuted. Later, courts heard cases in which women had not raised the hue and cry after having been raped. In those cases, however, the courts allowed the evidence of the woman's silence to be introduced as a self-contradiction to her later claim of rape." (Internal quotation marks omitted.) *State* v. *Troupe*, supra, 237 Conn. 294, quoting *State* v. *Hill*, supra, 121 N.J. 157–58.

[2] The New Jersey Supreme Court held that "to qualify as fresh complaint a victim's statements regarding the rape should not be extracted by coercive questioning. We leave it to the trial court to examine all the circumstances of the questioning to determine whether the line between coercive and benign questioning has been crossed. Likewise, the trial court in its discretion may, but need not, exclude cumulative fresh-complaint testimony that is prejudicial to [the] defendant." *State* v. *Hill*, supra, 121 N.J. 170.

[3] The Supreme Court of California held: "We conclude . . . that evidence of the fact of, and the circumstances surrounding, an alleged victim's disclosure of the offense may be admitted in a criminal trial for nonhearsay purposes under generally applicable evidentiary principles, provided the

rule. In *Troupe,* Connecticut modified the constancy of accusation doctrine, holding "that a person to whom a sexual assault victim has reported the assault may testify only with respect to the fact and timing of the victim's complaint; any testimony by the witness regarding the details surrounding the assault must be strictly limited to those necessary to associate the victim's complaint with the pending charge . . . ." *State* v. *Troupe,* supra, 237 Conn. 304. The Supreme Judicial Court of Massachusetts has not abandoned or modified the fresh complaint rule.[4] Furthermore, I note that *Troupe* cites all three of those persuasive cases and quotes extensively from *Hill* in its reasoning. More importantly, I note that within the last dozen years, the highest courts of New Jersey, Massachusetts and California have acknowledged the unfortunate societal bias that not merely justifies the admission into evidence of complaints made to other people by victims of sexual assault, but which necessitates the constancy of accusation doctrine. I believe the unfortunate circumstances are worth repeating.

"Indisputably, one of the historic premises of the doctrine—that it is natural for the victim of sexual assault to complain promptly following the assault—has been discredited substantially in contemporary times. The overwhelming body of current empirical studies, data, and other information establishes that it is *not* inherently natural for the victim to confide in someone or to disclose, immediately following commission of the offense, that he or she was sexually assaulted. . . . At the same time, these courts have also recognized that many people still adhere to the belief that a rape victim ordinarily will report the crime

---

evidence meets the ordinary standard of relevance." *People* v. *Brown,* supra, 8 Cal. 4th 763.

[4] "[W]e shall continue to hold admissible both the fact and the details of a fresh complaint." *Commonwealth* v. *Licata,* supra, 412 Mass. 658.

and that the failure of the victim to do so casts doubt on the credibility of the accusation. Consequently, most of the jurisdictions that have had occasion to consider the continued efficacy of the doctrine have decided to retain it in recognition of the unfortunate fact that the prejudices underlying the doctrine remain all too prevalent in our society." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 300–301.

"[T]he fresh-complaint doctrine is rooted in sexist notions of how the 'normal' woman responds to rape. We acknowledge the doctrine's misguided history and attempt to cure the defects underlying the rule that could infect rape proceedings with anti-female bias. Nonetheless, we conclude that women victims are better served by the continuance of the fresh-complaint doctrine than by its elimination. The present rule as designed neutralizes jurors' negative inferences concerning the woman's silence after having been raped." *State* v. *Hill*, supra, 121 N.J. 170.

In conclusion, I also point out that our Supreme Court rejected a similar call to abandon the *Troupe* constancy of accusation doctrine just last year in *State* v. *Kelly*, 256 Conn. 23, 35–40, 770 A.2d 908 (2001). Here, the defendant argues that *Troupe* permits the state to call numerous witnesses to repeat the complaint, thereby causing him prejudice. Although Judge Landau in his concurrence in *Kelly* addressed the prejudice that may result from the testimony of multiple constancy of accusation witnesses; id., 100–105 (*Landau, J.*, concurring); the majority of our Supreme Court was not persuaded to abandon the constancy of accusation doctrine.[5]

[5] The Supreme Judicial Court of Massachusetts, which has refused to abandon the fresh complaint rule, also has noted concern about repetitive testimony from several witnesses regarding the details of the complaint and has instructed trial courts to exclude evidence that "may lend undue credibility to the complainant's testimony." *Commonwealth* v. *Licata*, supra, 412 Mass. 659. "Fresh complaint evidence is corroborative only if it shows the victim seasonably complained of the attack. Because the evidence is

Due to the continued societal bias against the victims of sexual assault, I think that it would be a poor public policy decision to abandon Connecticut's constancy of accusation doctrine. I therefore respectfully concur in the majority opinion.

corroborative, the judge may exclude needless repetition of the details of the fresh complaints." Id., 660. The Supreme Court of New Jersey also has addressed the issue. See footnote 2.